IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 1, 2020 Session

## KIMBERLEY ARNOLD BATES v. CHARLES ANTHONY BATES

**Appeal from the Circuit Court for Wilson County**
**No. 2018-DV-8      Clara W. Byrd, Judge**

_____

### No. M2019-00505-COA-R3-CV

_____

A wife filed for divorce after approximately seventeen years of marriage. Following a bench trial, the trial court declared the parties divorced, divided the marital estate, and awarded the wife alimony in futuro. The husband appealed, challenging the trial court's valuation of his separate property interest in a closely held corporation and the division of the marital estate. We have determined that the trial court erred in undervaluing the husband's separate property interest and modify the valuation to $255,000. Because the trial court failed to allocate all of the marital debt, we vacate the trial court's division of the marital estate and award of alimony and remand the case for further consideration.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part as Modified, Vacated in Part, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Donald N. Capparella and Kimberly Ann Macdonald, Nashville, Tennessee, and Melanie R. Bean, Lebanon, Tennessee, for the appellant, Charles Anthony Bates.

David W. Garrett and Jacob T. Thorington, Franklin, Tennessee, for the appellee, Kimberley Arnold Bates.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Kimberley Arnold Bates[1] ("Wife") and Charles Anthony Bates ("Husband") married on May 31, 2001. They had been married to each other once before, with their

_____

[1] Wife's name also appears in the record as "Kimberly."

first marriage ending in divorce on November 20, 1997. On January 5, 2018, approximately seventeen years after marrying for the second time, Wife filed for divorce.[2]

The trial court heard the matter over the course of five days in January and February 2019. The primary issue at trial and on appeal concerns the classification and valuation of Husband's interest in a car dealership at the time of the parties' second marriage. During the parties' first marriage, Husband became the general sales manager of Burchett Ford Subaru, Inc. (the "Company"). He acquired a 20% interest in the Company in 1994 after entering into a Management and Buy and Sell Stock Agreement ("the Agreement") with the owner of the Company, Glen Burchett. At the time Husband and Mr. Burchett signed the Agreement, the total value of the Company was $1,000,000. The Agreement provided that, in exchange for Husband continuing to work as the general sales manager, Mr. Burchett agreed to surrender "eighty (80) shares of the Company stock" and to issue them to Husband on a vesting schedule from 1995 through 1997. In the Agreement, both Husband and Mr. Burchett agreed that the eighty shares had a value of $2,500 per share. Thus, the total amount of Husband's interest in the Company at that time was $200,000, while Mr. Burchett's interest was $800,000.

The Agreement contained a provision that allowed the Company to terminate Husband's employment "for cause," which the Agreement defined to include only the following: (1) "any dishonesty, fraud or criminal activity in connection with the operation of the Company" or (2) "any disability or incapacity which prevents [Husband] from performing the duties of his employment for 120 consecutive days." If the Company terminated Husband for any reason, the Agreement required him to sell back to the Company the eighty shares he acquired under the Agreement for $1,250 per share and any shares he later purchased, if any, for $2,500 per share. The Company never terminated Husband.

The Agreement also included a buy-sell provision that provided, in pertinent part, as follows:

> The Company agrees to buy or redeem and Burchett for himself, his estate, his Personal Representative and his heirs agrees to sell any and all stock in the Company that he owns at the date of his death for $2,500 per share, it being understood that the Company will apply to the purchase of said stock the net proceeds of any insurance policy that it owns on the life of Burchett and that the principal balance for said stock will be paid in five (5) equal annual installments plus seven percent (7%) per annum on the unpaid principal balance until paid in full.
> . . . .

---

[2] The parties had two children from their first marriage. Both children were adults when Wife filed for divorce in 2018, and they are not a subject of this appeal.

It is specifically agreed by each of the parties that the purpose of the agreements as here set out . . . is to establish a smooth transition and uninterrupted transfer of the stock and ownership and full operation of the Company to [Husband] upon Burchett's incapacitation or death and each party agrees for themselves, their heirs or assigns, that they will take no action that will hinder or disturb this intended transition.

When the parties divorced the first time in 1997, they entered into a Marital Dissolution Agreement ("MDA") that awarded Husband "all right, title in and to any ownership interest he ha[d] in [the Company]." Husband testified that, at the time of the parties' second marriage in 2001, he still owned the eighty shares he received under the Agreement and had not purchased any additional shares. Following Mr. Burchett's death in May 2007, however, Husband purchased the outstanding 320 shares of the Company stock that Mr. Burchett had owned for $800,000 ($2,500 per share) and changed the name of the Company to Bates Ford.[3] Husband stated that he borrowed the $800,000 from Wilson Bank and Trust and then used funds from the Company to pay off the loan by creating a shareholder receivable.

Both parties presented expert testimony regarding the value of Husband's 20% interest in the Company at the time of the parties' second marriage and the value of the Company at the time of trial. Scott Womack testified on behalf of Wife. He began with his valuation of Husband's 20% interest in the Company at the time of the parties' second marriage in 2001. He provided the trial court with two valuations based on two different methods. First, he used a combination of the Company's income, assets, and fair market value to calculate that the Company had a value of $2,120,000 in 2001. Because the stock was restricted and Husband did not have a controlling interest, Mr. Womack then applied a 20% discount for lack of marketability and a 20% discount for lack of control to conclude that the value of Husband's 20% interest was $255,000 in 2001. Second, Mr. Womack testified that he believed that the termination provision in the Agreement was a better indicator of the value of Husband's 20% interest in 2001. After providing the trial court with his interpretation of the Agreement, Mr. Womack concluded that the value of Husband's 20% interest in 2001 was $100,000 because that was the maximum amount the termination provision allowed him to sell his stock for at that time.

Mr. Womack then testified regarding his valuation of the Company at the time of trial. He stated that his valuation method blended the tangible book value of the Company—"the assets you can see, touch, feel"—and the intangible value of the Company's residual goodwill. Using this method, he determined that the Company had a value of $3,463,000 at the time of trial. Mr. Womack acknowledged that his valuation did not include $935,000 in shareholder receivables that he described as personal debt Husband

---

[3] Husband has appeared in advertisements for Bates Ford stating the catch phrase, "We'll trade for anything that don't eat."

owed to the Company. He explained that the trial court could account for that by deducting the shareholder receivables debt from his valuation or it could be included with the marital debt.

Dr. Mark Schmitz testified on behalf of Husband. Regarding Husband's 20% interest in the Company at the time of the parties' second marriage, Dr. Schmitz agreed with Mr. Womack that the total value of the Company in 2001 was $2,120,000. Dr. Schmitz determined, however, that the Agreement capped the value of Mr. Burchett's 80% interest in the Company at $800,000. Thus, Dr. Schmitz concluded that the remaining value of the Company, $1,320,000, belonged to Husband as accrued equity.

With respect to the value of the Company at the time of trial, Dr. Schmitz testified that the method he used was similar to that used by Mr. Womack except he used non-depreciated values to calculate the net tangible assets, whereas Mr. Womack used depreciated values. Dr. Schmitz included the shareholder receivables debt when making his valuation determination and concluded that the Company was worth $3,090,000 at the time of trial.

Wife testified that she was fifty years old and had no college or technical school education. Throughout the marriage, she had no significant employment outside of the home but fulfilled her role as caregiver and homemaker. When the parties moved into the marital residence that is located on a farm, she managed and operated the farm. Based on her qualifications and limited work experience, Wife believed the most she could earn was $25,000 per year.

At the conclusion of the trial, the trial court declared the parties divorced and made findings of fact and conclusions of law from the bench that were incorporated by reference into the final decree of divorce entered on February 20, 2019. The trial court classified Husband's 20% interest in the Company as his separate property and valued it at $100,000. The court based its valuation on the termination provision of the Agreement because the court found that "to be the most compelling evidence of the value of the stock because it was agreed to by [Husband and Mr. Burchett]." Because the court found Wife's expert credible and Husband's expert not credible, the court adopted Mr. Womack's valuation of the Company at the time of trial as $3,463,000. After subtracting the $100,000 for Husband's separate property interest in the Company, the court found that his interest in the Company appreciated by $3,363,000 and classified the appreciation as a marital asset. The court then divided the marital estate "50-50," with each party receiving $2,311,000 in marital assets. Finally, the court concluded that Wife had need for alimony and awarded her alimony in futuro in the amount of $3,000 per month. Husband timely appealed.

ANALYSIS

I.  Valuation of Husband's premarital interest in the Company.

A.  Applicable legal standards.

Because Tennessee is a dual property state, a trial court must identify all of the divorcing parties' assets and classify them as either separate property or marital property prior to making an equitable division of the marital estate pursuant to Tenn. Code Ann. § 36-4-121. *Gilbert v. Gilbert*, No. E2009-02118-COA-R3-CV, 2011 WL 13165341, at *3 (Tenn. Ct. App. Sept. 15, 2011). Only marital property is subject to division, and it is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce." Tenn. Code Ann. § 36-4-121(b)(1)(A); *see also Gilbert*, 2011 WL 13165341, at *4. Separate property, as relevant here, is defined as "[a]ll real and personal property owned by a spouse before marriage" and "[i]ncome from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1)." Tenn. Code Ann. § 36-4-121(b)(2)(A), (C).

After classifying property as either separate or marital, a trial court should "place a reasonable value on each piece of property subject to division." *Owens v. Owens*, 241 S.W.3d 478, 486 (Tenn. Ct. App. 2007). When determining the value of a marital asset, "a trial court should consider all competent and relevant evidence pertaining to the valuation of that asset." *Bertuca v. Bertuca*, No. M2006-00852-COA-R3-CV, 2007 WL 3379668, at *4 (Tenn. Ct. App. Nov. 14, 2007). The parties bear the burden of presenting competent evidence for the trial court to consider in making a proper valuation determination. *Id.* A trial court is then "free to place a value on a marital asset that is within the range of evidence submitted." *Id.*

Issues concerning the classification and valuation of property present questions of fact. *Inzer v. Inzer*, No. M2008-00222-COA-R3-CV, 2009 WL 2263818, at *4 (Tenn. Ct. App. July 28, 2009); *Owens*, 241 S.W.3d at 485. Therefore, we review a trial court's decision classifying and valuing property de novo with a presumption of correctness, unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Bertuca*, 2007 WL 3379668, at *4. A trial court's conclusions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

"[B]ecause trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses,'" appellate courts afford them "considerable deference when reviewing issues that hinge on the witnesses' credibility." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). We will

not reevaluate a trial court's assessment of a witness's credibility unless there is clear and convincing evidence to the contrary. *Id.* Evidence is clear and convincing if it "eliminate[s] any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* at 692-93 (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)).

### B. Value provided by the Agreement.

Both parties agree that the trial court correctly classified Husband's 20% interest in the Company at the time of the second marriage as his separate property. Husband argues, however, that the trial court erred in relying on the termination provision of the Agreement to determine that his premarital interest was worth only $100,000. He contends that the trial court should not have relied on the termination provision of the Agreement to value his premarital interest because he was never terminated and, under that provision, he could only sell his 80 shares if his employment were terminated. Husband further contends that the trial court should not have relied upon the Agreement to value his 80 shares because he had no intention to sell the stock. For the reasons discussed below, we agree.

This Court considered a similar issue in *Harmon v. Harmon*, No. W1998-00841-COA-R3-CV, 2000 WL 286718 (Tenn. Ct. App. Mar. 2, 2000). In *Harmon*, the trial court based its valuation of the husband's ownership in a limited partnership solely on the terms of the husband's buy-sell agreement with the business because the court found the agreement controlled the issue. *Harmon*, 2000 WL 286718, at *5. After reviewing case law from other jurisdictions, we adopted the majority view that "the value established in the buy-sell agreement of a closely-held corporation, not signed by the non-shareholder spouse, is not binding on the nonshareholder spouse but is considered, along with other factors, in valuing the interest of the shareholder spouse." *Id.* at *8. Here, Wife did not sign the Agreement and was not bound by the values set by the Agreement. Thus, the Agreement's valuation of Husband's 80 shares in the termination provision does not control the issue. It is but one of the factors to be considered for determining Husband's premarital interest in the Company. *See id.* at *8. The termination provision, however, affected the value of the 80 shares only if he was terminated. Because Husband was never terminated, this provision does not affect the value of his premarital interest. Moreover, because the record contains no evidence that Husband ever intended to sell his shares, the Agreement is not applicable for determining value. *See Bertuca*, 2007 WL 3379668, at *8 (holding that buy-sell provision did not affect the value of the husband's interest in a partnership because "such a provision only affects the value if he plans to sell his interest in the partnership," and there was no evidence he intended to sell). We conclude that the trial court erred in relying on the Agreement to value Husband's premarital interest in the Company.

C. Alternate valuation provided by Mr. Womack.

The Agreement was not the only valuation evidence the parties presented. Wife's expert also testified about an alternate method for valuing Husband's premarital interest. Mr. Womack stated that, by using a combination of the Company's income, assets, and fair market value, he calculated that the Company was valued at $2,120,000 in 2001. He then made a downward adjustment of the value due to a lack of marketability and a lack of control created by Husband's minority interest. After applying these discounts, Mr. Womack valued Husband's 20% interest at $255,000 in 2001.

Regarding valuation methods, this Court has stated as follows:

> There are a number of acceptable methods available to determine the value of a corporation. *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659, 666 (Tenn. 1983) recognized three of these methods: (1) the market value method, (2) the asset value method, and (3) the earnings value or capitalization of earnings method. There are still others including the dividend method and the liquidating value method. *See* B. Goldberg, *Valuation of Divorce Assets* §§ 6.5-6.8 (1984). The choice of the proper method or combination of methods depends upon the unique circumstances of each corporation.
> A public corporation's value is most reliably determined using the market value method. *Blasingame v. American Materials, Inc.*, 654 S.W.2d 659, 666 (Tenn. 1983). This method presumes that there is an established market for the corporation's stock which will enable the court to arrive at the price a willing buyer would pay for the stock. The stock in closely held corporations is rarely traded. Thus, it is improper to attempt to place a value of a closely held corporation using the method generally used to place a value on a public corporation. *Lotz v. Lotz*, 120 Cal. App. 3d 379, 384, 174 Cal. Rptr. 618, 621 (1981).
> Determining the value of a closely held corporation is not an exact science. *In re Marriage of Mullins,* 121 Ill. App. 3d 86, 76 Ill. Dec. 560, 562, 458 N.E.2d 1360, 1362 (1984). The courts have not articulated a consistent approach to the valuation of this type of marital asset. However, Rev. Rul. 59-60, 1959-1 C.B. 237 has been recognized as providing the most comprehensive guide to making this determination. B. Goldberg, *Valuation of Divorce Assets* §§ 1.12 & 6.6 (1984) and 24 Am. Jur. 2d *Divorce and Separation* § 947 (1983). But Rev. Rul. 59-60 is intended to be only a guide. It was never intended to be an inflexible rule. *Turgeon v. Turgeon,* 190 Conn. 269, 460 A.2d 1260, 1265 (1983).
> Rev. Rul. 59-60 contains nine factors which should be considered when determining a closely held corporation's value. These factors include:
> (1) the nature of the business, including its history since organization,

(2) the economic status of the industry and the nation at the critical date of valuation,

(3) book value,

(4) earnings,

(5) dividends and dividend paying capacity,

(6) the existence or lack of good will or other intangible value,

(7) sales of the stock and the size of the block to be valued,

(8) the selling price of comparable securities relative to their earnings, dividends and asset values,

(9) the life insurance proceeds received by a corporate beneficiary on a policy covering the sole or controlling stockholder.

*Wallace v. Wallace*, 733 S.W.2d 102, 107-08 (Tenn. Ct. App. 1987); *see also Anderson v. Anderson*, No. E2005-02110-COA-R3-CV, 2006 WL 2535393, at *3-4 (Tenn. Ct. App. Sept. 5, 2006).

Mr. Womack's alternate method for valuing Husband's interest in the closely held company applied the foregoing principles. As Mr. Womack testified, his alternate valuation method combined the asset, income, and market value methods. He also considered the value of the Company's good will and then discounted his valuation, as discussed above. The reasons Mr. Womack provided for discounting the value of Husband's 20% interest are persuasive, and the evidence does not preponderate against discounting the value by 40%. We conclude, therefore, that Mr. Womack's alternate method provided the appropriate valuation. The trial court's finding of value is increased to $255,000.

D. Appreciation of Husband's premarital interest.

Husband next argues that the trial court erred in undervaluing his premarital interest at the time of the parties' second marriage because the court ignored the appreciation of this interest due to the bundle of rights the Agreement assigned to him. He asserts that the Agreement assigned him a blocking right that absorbed all excess equity in the Company above $800,000 by capping Mr. Burchett's 80% interest in the Company at $800,000. Thus, Husband contends that his 20% interest in the Company was valued at $1,320,000 in 2001—the difference between the total value of the Company in 2001 ($2,120,000) and Mr. Burchett's capped value ($800,000). To support his argument, Husband relies on the following language from the buy-sell provision in paragraph 4 of the Agreement:

It is specifically agreed by each of the parties that the purpose of the agreement[] . . . is to establish a smooth transition and uninterrupted transfer of the stock and ownership and full operation of the Company to [Husband] upon Burchett's incapacitation or death and each party agrees for themselves,

their heirs or assigns, that they will take no action that will hinder or disturb this intended transition.

The trial court dismissed Husband's argument on this issue because it found that Mr. Burchett continued to control the Company at the time of the parties' second marriage. The court stated, in pertinent part, as follows:

> The evidence that Mr. Burchett continued to control the stock were the facts that Mr. Burchett maintained full control, one, with regard to the rent. The company - - the dealership or company had to rent the building. The building was his most valuable asset. He never entered any kind of relinquishment or control where [Husband] could purchase the building . . . . Mr. Burchett never gave up control of the property.
> In fact, he basically doubled the rent. He required the company to pay him approximately $20,000 per month in rent just to operate on the premises, while at the same time retaining control over his controlling interest of the business and the profits and those things. . . .
> But, also, there was an issue back where Mr. Burchett, having controlling ownership, could have objected to another Ford dealership being located on the interstate close by . . . and Mr. Burchett did not choose to object at all, and as a result, a competitor was allowed to come in to the same county and is an ongoing competitor of Bates Ford. . . . Mr. Burchett had the right to object to that and did not, and Mr. Bates tried later, but it was too late to object, and he didn't really have the control to object prior to Mr. Burchett's death.

The evidence does not preponderate against these findings. It is evident from the language quoted above that Husband and Mr. Burchett did not intend for the buy-sell provision to apply until Mr. Burchett's "incapacitation or death." Upon Mr. Burchett's incapacitation or death, the terms of the provision would then apply and neither Husband, Mr. Burchett, nor Mr. Burchett's heirs could take any action that would "hinder or disturb" transfer of the Company to Husband. Thus, until Mr. Burchett either became incapacitated or died, he maintained control of the Company and could do as he pleased regardless of any objection from Husband. Mr. Burchett did, in fact, control the Company as he wanted with no interference from Husband, as evidenced by his actions in increasing the dealership's rent and allowing a competitor to come into the same county. Finally, we find no language in the Agreement providing Husband with a blocking right, capping Mr. Burchett's interest at $800,000, or stating that all equity in excess of that amount accrued to Husband.

Husband also contends that the trial court undervalued his premarital interest by assigning no value to his stock option. According to Husband, the buy-sell provision in paragraph 4 of the Agreement assigned him a stock option allowing him to purchase Mr.

Burchett's shares at $2,500 per share at the time of Mr. Burchett's death or incapacitation. A stock option has been defined as "[a]n option to buy or sell a specific quantity of stock at a designated price for a specified period regardless of shifts in market value during the period." BLACK'S LAW DICTIONARY (11th ed. 2019). To determine whether Husband had a stock option, we look to the Agreement itself. "A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). Because parties are free to contract as they wish, "[c]ourts defer to the contracting process by enforcing contracts according to their plain terms without favoring either contracting party. Courts will decline to rewrite contracts made by the parties and will decline to relieve parties of their contractual obligations, absent an inability to contract or an unconscionable agreement." *Seraphine v. Aqua Bath Co., Inc.*, No. M2000-02662-COA-R3-CV, 2003 WL 1610871, at *8 (Tenn. Ct. App. Mar. 28, 2003) (citing *Cocke Cnty. Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)); *Petty v. Sloan*, 277 S.W.2d 355, 359 (Tenn. 1955); *Jaffe v. Bolton*, 817 S.W.2d 19, 25 (Tenn. Ct. App. 1991)). The interpretation of a written agreement presents a question of law that we review de novo with no presumption of correctness. *Allstate Ins. Co.*, 195 S.W.3d at 611.

The buy-sell provision in paragraph 4 of the Agreement provides that the purpose of the Agreement "is to establish a smooth transition and uninterrupted transfer of the stock and ownership and full operation of the Company to [Husband] upon Burchett's incapacitation or death." This language evidences an intent for Husband to assume full ownership and control of the business upon Mr. Burchett's death or incapacitation. Contrary to Husband's assertion, however, the Agreement does not specify a price at which Husband may purchase Mr. Burchett's shares upon Mr. Burchett's death or incapacitation. Rather, the buy-sell provision provides, in pertinent part, as follows: "The *Company* agrees to buy or redeem and Burchett for himself, his estate, his Personal Representative and his heirs agrees to sell any stock in the Company that he owns at the date of his death for $2,500.00 per share." (Emphasis added). This language clearly and unambiguously allows the Company, not Husband, to purchase Mr. Burchett's shares for $2,500 per share upon Mr. Burchett's death or incapacitation. We fail to find any language in the Agreement setting a price at which Husband could purchase the outstanding shares from Mr. Burchett or the Company. Consequently, we conclude that the Agreement did not assign Husband a stock option.

In light of the foregoing, we conclude that the trial court did not undervalue Husband's premarital interest by finding no appreciation in value due to a blocking right or stock option.[4]

---

[4] Because we conclude that Husband did not have a stock option, Husband's argument that the appreciation in the value of the Company should be classified as his separate property under Tenn. Code Ann. § 36-4-121(b)(iii) is pretermitted.

II. Division of the marital estate.

Finally, Husband argues that the trial court erred in its division of the marital estate. After the parties' property has been classified as either separate or marital, a trial court must divide the marital estate equitably by considering the relevant factors identified in Tenn. Code Ann. § 36-4-121(c).[5] *Larsen-Ball v. Ball*, 301 S.W.3d 228, 234 (Tenn. 2010). To be considered equitable, the division of marital property does not need to be "precisely equal" and it is not necessary that each party "receive a share of every piece of marital property." *Owens*, 241 S.W.3d at 490. Because "[t]he division of the marital estate includes both the division of the marital property and the allocation of the marital debt," appellate review of a trial court's division of marital property "must take into consideration how the trial court allocated the marital debt." *Id.* A trial court has "broad discretion in fashioning an equitable division of marital property," *id.,* and we will not "'disturb the trial court's decision unless the distribution lacks proper evidentiary support or results from

---

[5] The relevant factors include the following:

> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5) (A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given same weight if each party has fulfilled its role;
> (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.
> (6) The value of the separate property of each party;
> (7) The estate of each party at the time of the marriage;
> (8) The economic circumstances of each party at the time the division of property is to become effective;
> (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
> (10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;
> (11) The amount of social security benefits available to each spouse; and
> (12) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-4-121(c).

some error of law or misapplication of statutory requirements and procedures.'" *Davis v. Davis*, No. M2015-02106-COA-R3-CV, 2016 WL 7479138, at *2 (Tenn. Ct. App. Dec. 29, 2016) (quoting *Watson v. Watson*, 309 S.W.3d 483, 495 (Tenn. Ct. App. 2009)).

Husband asserts that, when dividing the marital estate, the trial court failed to consider a shareholder receivables debt in the amount of $935,000. As previously discussed, Mr. Womack valued the Company at $3,463,000. He testified that, when he made his valuation, he subtracted $241,000 in shareholder receivables as debts. During trial, Husband presented evidence that there was an additional $935,000 in shareholder receivables debt that Mr. Womack did not include in his calculations. Mr. Womack acknowledged that his calculations did not include the additional shareholder receivables but explained that he did not include them because he had not been made aware of them until trial. Regarding how the additional shareholder receivables debt should be addressed, Mr. Womack testified, in pertinent part, as follows:

Q. If I understood your testimony, you're admitting that those shareholder receivables need to be an offset. That's the words I wrote down. Correct?
A. In other words, I've reflected - - I wouldn't alter the valuation of the dealership. So I've reflected them as an asset of the dealership. But if there's a corresponding personal liability, then, again, that value of that asset moves to the marital balance sheet. If there's a corresponding liability, that would offset - - an easier word - - or it may have been my word.
Q. So it would be an offset, correct?
A. Yes.
Q. And if it is an offset, then that is a, for lack of better terms, deduction or reduction of your ultimate value on pages 2 and 22 of your exhibit, correct - - of your report?
A. Not really.
Q. Okay. Well if it's a personal liability of Mr. Bates to the company, it's got to be taken into consideration somewhere, correct?
A. Correct.
. . . .
Q. But the same point is that it's a 900 - - or whatever - - we'll add up the number. It's an offset against the value of the business, correct?
A. I mean, I think there's two ways to treat it.
Q. Is that a yes or a no to my answer? I think it's a yes, right?
THE COURT: I think it's a yes and no.
A. Yes and no. I mean, you could treat it that way.
. . . .
Q. But on the yes part, practical common sense, we reduce your 3,463,000 by the amount of the shareholder receivables, correct?
A. You would get to the same place.

- 12 -

Q. All right. So if we add up the shareholder receivables that are listed that we have identified here on the Exhibit Number 49 - - and you had already backed out the $241,605 in line 37, correct?

A. I believe that's correct.

Q. So of the $1,069,075 that's on Exhibit 49, we know that, per Exhibit Number 37, 935,137 of those is attributable directly to Mr. Bates.

. . . .

Q. If we take it off of the business, that means that your 3.4 million 63 on page 2 and 22 comes down to about 2.4, right?

A. That's one way of doing it.

Q. Okay. That's not an incorrect way of doing it. It's just one way of doing it. Of course, the Court can offset it. You're saying it definitely is an offset?

A. It's a personal debt owed.

Thus, the additional $935,000 in shareholder receivables debt needed to be taken into account when the trial court divided the marital estate by either subtracting it from Mr. Womack's $3,463,000 valuation of the Company or including it with the marital debt.

In the final decree, the trial court adopted Mr. Womack's $3,463,000 valuation of the Company along with Wife's valuation of the parties' remaining real and personal property to find that the total value of the marital estate was $6,047,069.71. After subtracting $100,000 for Husband's separate property and allocating marital debt to Husband in the amount of $1,173,397.96, the trial court found that the equity in the marital estate was $4,622,000.[6] Due to the length of the parties' marriage, the trial court concluded that "a 50-50 split" would be an equitable division of the marital property, with each party receiving $2,311,000 in assets. The court awarded Wife the marital residence, which was valued at $800,000, and $545,805 in proceeds from an escrow account, totaling $1,345,805. Because Wife needed to receive an additional $965,230.80 for the division to be "50-50," the court awarded her 28% of the Company stock, which would allow her to receive a yearly income of $84,000.

Due to its adoption of Mr. Womack's $3,463,000 valuation of the Company, the trial court needed to allocate the additional $935,000 in shareholder receivables debt along with the marital debt. A thorough examination of the final decree shows that the $1,173,397.96 in marital debt the trial court allocated to Husband included only the following debts: (1) $174,297.83 owed on real property located at 3925 Cedar Forest Road; (2) $392,000 owed on real property located at 4463 Leeville Pike; (3) $221,981.82 owed on real property located at 420 East Main Street; (4) $298,446.41 owed on real

---

[6] In its oral ruling, the trial court stated that the equity was $4,000,622.71. We believe this was a clerical error because the court went on to state that each party should receive $2,311,000, which if doubled, yields a total of $4,622,000. Moreover, the trial court stated that it was adopting the values listed in Exhibit 64, which Wife entered as a proposed division of the marital estate; Exhibit 64 states that the equity was $4,622,071.75.

- 13 -

property located at 1780 Franklin Road; and (5) $86,672.00 owed to the Internal Revenue Service. We fail to find anywhere in the final decree where the trial court allocated the additional $935,000 in shareholder receivables debt. Therefore, the trial court failed to completely divide the marital estate. *See Owens*, 241 S.W.3d at 490 ("Trial courts have not completely divided a marital estate until they have allocated both the marital property and the marital debt."). We vacate the trial court's division of the marital property and the award of alimony and remand the case to the trial court for further consideration.

III.  Attorney Fees.

Wife requests that she be awarded her attorney fees on appeal. A decision to award attorney fees on appeal falls within the sole discretion of this Court. *Diffie v. Diffie*, No. M2018-00267-COA-R3-CV, 2019 WL 1785683, at *15 (Tenn. Ct. App. Apr. 23, 2019). When deciding whether to grant or deny a request for attorney fees incurred on appeal, we consider "'the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered.'" *Stratienko v. Stratienko*, 529 S.W.3d 389, 413 (Tenn. Ct. App. 2017) (quoting *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 WL 22071454, at *10 (Tenn. Ct. App. Sept. 3, 2003)). After considering these factors, we deny Wife's request.

CONCLUSION

The judgment of the trial court finding that Husband's 20% interest in the Company at the time of the parties' second marriage constituted his separate property is affirmed, but the value of Husband's separate property is increased from $100,000 to $255,000. The trial court's division of the marital estate and the award of alimony to Wife are vacated, and this matter is remanded to the trial court for further consideration in accordance with this opinion. Costs of appeal are assessed against the appellee, Kimberley Arnold Bates, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

- 14 -